## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEBRASKA

ANGEL S. JONES,

              Plaintiff,

vs.

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,

              Defendant.

4:15-CV-3128

MEMORANDUM AND ORDER

This matter is before the Court on the denial, initially and upon reconsideration, of plaintiff Angel S. Jones' disability insurance benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq.* and § 1381 *et seq.* The Court has considered the parties' filings and the administrative record and affirms the Commissioner's decision to deny benefits.

### I. PROCEDURAL HISTORY

Jones filed applications for disability insurance benefits and supplemental security income in December 2011. T373-402. Jones' claims were denied initially (T166-69; T170-173; T174-78) and on reconsideration (T182-90; T191-199; T200-09). Following two hearings—the first on November 19, 2013, and the second on April 29, 2014—the administrative law judge (ALJ) found, in a decision dated May 19, 2014, that Jones was not disabled as defined under 42 U.S.C. §§ 416(i), 423(d), or 1382a(3)(A), and therefore not entitled to disability benefits. T24. The ALJ determined that, although Jones suffered from severe impairments, she had the residual functional capacity to perform other jobs that exist in significant numbers in the national economy. T13-24; T36-47; T59-70. The Appeals Council of the Social Security Administration denied Jones' request for review of the ALJ's decision. T1-4. Jones' complaint seeks review of the ALJ's decisions as the final decision of the Commissioner under sentence four of  42 U.S.C. § 405(g). Filing 1.

## II. FACTUAL BACKGROUND
### 1. MEDICAL HISTORY

Jones' medical records generally reflect a history of bipolar disorder and depression dating back to at least 2006. At that time, Jones visited Joe Travis, M.D., in connection with a state-funded program in which Jones was to provide daycare services. *See* T115-119. Specifically, Jones asked Travis to submit a letter on her behalf to a state social service agency regarding her ability to provide childcare with an underlying diagnosis of bipolar disorder. Travis endorsed this idea, and his notes reflect that Jones' bipolar disorder was under control, and her affect, generally speaking, was "very bright." T573. Thus, given the positive nature of the visit, Travis wrote to the state on Jones' behalf indicating that, in his opinion, Jones was capable of working with children.

Jones' medical records then jump to 2009, when Jones visited Anne Hoeman, certified physician assistant, regarding self-inflicted cuts on her arms and legs. T610. Jones reported that she would unconsciously cut herself in the night, causing her to wake up with bloody sheets. Jones remarked that she had been cutting herself for about 9 years, but that she had no intent of hurting herself. T610. Impressions from the visit, as reflected in Hoeman's notes, were (1) unconscious self-inflicted injury, and (2) history of disassociation disorder and depression. T577. Hoeman prescribed Paxil and Ambien, and encouraged Jones to begin counseling. Jones visited Hoeman's office on at least two subsequent occasions—once in October 2009, and again in October 2010—for general symptoms related to fatigue and depression. *See*, T607; T606. Hoeman refilled or increased Jones' prescription for Paxil each time, and again encouraged her to seek counseling.

In connection with Jones' prior application for disability benefits, a psychological interview was performed in July 2009 by Twila Preston, Ph.D. T580. Jones told Preston that she had manic depressive disorder and bipolar disorder, and that she had "massive" mood swings. She further reported that when she became angry, she would lose "chunks of time," and that she occasionally woke up with cuts on her arms and legs. T582. The cutting, she reported, corresponded with increased stress, and tended to occur when she slept at night, as opposed to during the day. T582. Jones also described a fear of being around other people, and relatedly, a reluctance to leave her home. T582. "She avoids people," Preston wrote, "because she is afraid 'they are all like my brother, threatening and potentially hurtful.'" T582. Preston's diagnoses included posttraumatic stress disorder, mood disorder not otherwise specified, borderline personality features, and attention deficit hyperactivity disorder inattentive type by history only. T583.

Overall, Preston described Jones as open, cooperative, and alert. T582. She wrote that Jones' speech was "logical, coherent, and goal-directed," and noted her appearance as "neat and clean." T582. But she also remarked that Jones had poor judgment, was anxious, and demonstrated poor frustration tolerance. T582. Accordingly, Preston opined that Jones could sustain concentration and attention for simple tasks, but would likely have more trouble with complicated tasks. Relatedly, while she could understand and remember short and simple instructions, "[s]he would have a difficult time carrying these out under ordinary supervision due to her avoidance of others." T583. Preston assigned Jones a global assessment of functioning (GAF) score of 40. T583.[1]

Jones, in connection with the present claim, was evaluated again in March 2012—this time by Michael Baker, Ph.D. T614. At that interview, Jones reported a history of bipolar disorder and attention deficit disorder, and stated that she last used Paxil in May 2011. With respect to her mental health status, Baker remarked that Jones was "alert and well oriented," and that she had "no difficulty following the train of conversation." T616. But, consistent with the prior evaluation, he also wrote that Jones' judgment and insight are "low," and that the cuts on her arm, while not deep enough to necessitate stiches, were nonetheless "obvious." T615. Baker's diagnoses included bipolar disorder, not otherwise specified, reported by history, and rule out borderline personality disorder. T616. He concluded:

> In regards to mental limitations related to work activities, [Jones] seems able to remember and understand instructions, procedures, and locations. Her maintenance of attention, concentration, and pace seems adequate for routine, noncomplex, tasks. She reports some social anxiety, but she interacted adequately during the session. If social or interpersonal demands were too stressful then that would be problematic. Her use of good judgment and responding appropriately to changes in the workplace would also be based on not overly stressful or complex work.

---

[1] A GAF is "the clinician's judgment of the individual's overall level of functioning," not including impairments due to physical or environmental limitations. See *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (hereinafter, "DSM-IV-TR"). A GAF score of 31-40 indicates some impairment in reality testing or communication; or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.

T616. Baker assigned Jones a GAF score of 50. T616.[2]

At the November 19, 2013 hearing on this claim, the ALJ ordered an additional psychological examination, which occurred in January 2014 with Margaret Donovan, Ph.D. T675. Donovan, too, noted Jones' remarks regarding social anxiety and frequent blackouts. As reflected in the report, the blackouts occurred during times of stress, and would often cause Jones to lose "two or three hours at a time." T677. Further, Jones told Donovan that the blackouts were the only time in which she engaged in cutting/self-mutilation, and that the blackouts occurred anywhere from once or twice a month, to once or twice a week, depending on whether she was taking medication. T677. Donovan's diagnoses included depressive disorder, not otherwise specified, reading disability (dyslexia), and borderline personality disorder with dissociation. T680. Donovan concluded:

> Because of her personality disorder [Jones] will have difficulty getting along with coworkers and bosses. She would definitely do better in a job where she had little contact with coworkers. She also would do better in a job where she is not around a lot of people as she has anxiety that strangers will harm her.

> The prognosis for the personality disorder is poor, especially since she is not in therapy and does not see that she can change anything. . . . Her prognosis for mood disorder is good if she takes the medication.

T680-81. Donavan assigned Jones a GAF score of 65. T680.[3]

The record also contains reviews from state agency psychological consultants Rebecca Braymen, Ph.D., and Linda Schmechel, Ph.D. Braymen, who conducted a review of Jones' records in connection with a separate application for benefits, indicated that Jones had moderate limitations in the ability to understand, remember, and carry out detailed instructions; to perform activities within a schedule; to work in proximity to others; to interact with the general public; and to respond appropriately in the work setting, to name a few. T586-87. Schmechel, who reviewed Jones' records in connection with the underlying claim, reached similar conclusions. In her

---

[2] A GAF score of 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting); or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV-TR at 34.

[3] A GAF score of 65 indicates some mild symptoms; or some difficulty in social, occupational, or school functioning, "but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

March 2012 assessment, she observed that Jones had "marked limitations" in the ability to understand and remember detailed instructions, and to interact appropriately with the general public. T619-20. She further concluded that Jones was moderately limited in her ability to, among other things, maintain attention and concentrate for extended periods, to set goals, and to carry out detailed instructions. T619-20. Despite these limitations, however, both consultants concluded that Jones could maintain some form of unskilled employment. *See*, T603; T637.

### 2. Hearing Testimony – November 19, 2013

Jones testified at the administrative hearing that she was unable to work because of "[i]ndiscretion," noting that she felt "[n]ervous" and "[i]tchy" in public, and that she would start "scratching" and "panicking" around others. T123. She also discussed her diagnosis for bipolar disorder, which contributes to her desire to be alone, "away from everything and everyone." T128. Jones said that she gets distracted easily, and that she has an attention span of 5 to 20 minutes, depending on whether she is on her medication. T129-30.

Jones also testified to other factors that, she contends, contribute to her inability to work. For example, she discussed her dyslexia, which prevents her from filling out job applications. T123-24. She also described herself as forgetful, noting that, in a previous job, she would sometimes forget to show up for work. T132. And she testified more generally to her medical history, stating that she was on Paxil and Meclozine at the time of the hearing, and that she had not seen a therapist for 13 years. T126-27.

Jones also described frequent blackouts, which, she says, cause her to lose chunks of time. She elaborated,

> A: I've always described them as white-outs. I'll be arguing with my mom one minute about taking the garbage out. And the next thing I know I'm sitting in my bedroom and I feel the overpowering need to apologize because I feel like I've done something.
>
> Q: Don't know what's happened in the interim period?
>
> A: No.
>
> . . .
>
> Q: How frequently does that occur?

A: Honestly, it happens quite often. And sometimes it doesn't happen until I go to sleep It's one of these—I'll remember laying down to go to sleep and the next thing I know I'm coming to and there are problems. My arms and legs will be covered in blood. Physical harm. Myself. I'm assuming that I wound up cutting myself. I've woke up from something like this fighting myself and hitting myself. But I don't remember ever doing anything.

T135-36.

The ALJ presented the vocational expert (VE) with a hypothetical based on a person who could lift 20 pounds on occasion and 10 pounds on a frequent basis; could sit or stand for 6 hours; has limited use of the extremities; has difficultly reading and writing; could write and change things on a computer; has the ability to "pace adequate [sic] for routine, non-complex tasks"; must work in an area with no interaction with the general public; must conduct routine, repetitive tasks; whom has a problem with change, and who must have minimal interactions with coworkers. T143-44. Such a person, the VE opined, could perform light, unskilled work, such as a production assembler, laundry worker, or hand packer. T144-145.

The ALJ, following cross-examination of the VE, ordered a follow-up consultative examination.

### 3. Hearing Testimony – April 29, 2014

Jones, at the second hearing, listed blackouts and physical pain as the most severe conditions that interfere with her ability to work. T85. With respect to physical pain, she cited problems with her hips, ankle, and spinal cord. When questioned about this condition, Jones said that she had been to a doctor the previous July, but that she had not been back—and was not currently on medication—due to financial constraints. T85-86.

The ALJ presented the vocational expert (VE) with a hypothetical similar to the one presented at the prior hearing. Specifically, the ALJ asked the VE to consider an individual: with no past relevant work; who could lift up to 20 pounds on occasion, 10 pounds on a frequent basis; who could stand for 6 hours or sit for 6 hours in an 8-hour day; who has unlimited use of the extremities; who could have no contact with the general public, and minimal contact with peers and supervisors, and coworkers; and who could perform simple, yet repetitious work. T101. Based on that hypothetical, the VE opined that such a person could perform light, unskilled work, such as housekeeping or production-type work. T101-102. Responding to the VE's assessment, the ALJ then added a condition to the hypothetical, asking the VE to assume, in

- 6 -

addition to the conditions described above, that the individual was unable to carry out short and simple instructions under ordinary supervision. T102. With that addition, the VE opined that the claimant would be unable to sustain work. T102. The ALJ then added a different condition—that the claimant would miss 2 or 3 days of work per month. T103. According to the VE, that addition, too, would render the claimant unable to work. T103.

### 4. SEQUENTIAL ANALYSIS AND ALJ FINDINGS

To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4).

### (a) Step One

At the first step, the claimant has the burden to establish that she has not engaged in substantial gainful activity since her alleged disability onset date. *Gonzales v. Barnhart,* 465 F.3d 890, 894 (8th Cir. 2006); 20 C.F.R. § 404.1520(a)(4)(i). If the claimant has engaged in substantial gainful activity, the claimant will be found not to be disabled; otherwise, the analysis proceeds to step two. *Gonzales,* 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(i).

In this case, the ALJ found that Jones had not engaged in substantial gainful activity since her alleged disability onset date, and that finding is not disputed on appeal. T13.

### (b) Steps Two and Three

At the second step, the claimant has the burden to prove she has a "medically determinable physical or mental impairment" or combination of impairments that is "severe[,]" 20 C.F.R. § 404.1520(a)(4)(ii), in that it "significantly limits h[er] physical or mental ability to perform basic work activities." *Gonzales,* 465 F.3d at 894; *see also Kirby v. Astrue,* 500 F.3d 705, 707-08 (8th Cir. 2007). Next, "at the third step, [if] the claimant shows that h[er] impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits." *Gonzales,* 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the analysis proceeds.

For mental impairments, at steps two and three of the sequential analysis, the ALJ utilizes a two-part "special technique" to evaluate a claimant's impairments and determine, at step two, whether they are severe, and if so, at step three, whether they meet or are equivalent to a "listed mental disorder." 20 C.F.R. § 404.1520a(a), (d)(1) and (2). The ALJ must first determine whether the claimant has "medically determinable mental impairment(s)." 20 C.F.R. § 404.1520a(b)(1). If any such impairment exists, the ALJ must then rate the degree of "functional limitation" resulting from

the impairment. 20 C.F.R. § 404.1520a(b)(2). This assessment is a "complex and highly individualized process that requires [the ALJ] to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." 20 C.F.R. § 404.1520a(c)(1).

Four "broad functional areas" are used to rate these limitations: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). These areas are also referred to as the "paragraph B criteria," which are contained in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 *et seq*. The first three criteria are rated using a five-point scale of none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). The fourth criterion, episodes of decompensation, is rated as: none, one or two, three, four or more. *Id*.

After rating the degree of functional limitation resulting from any impairments, the ALJ determines the severity of those impairments (step two). 20 C.F.R. § 404.1520a(d). Generally, if the first three functional areas are rated as "none" or "mild" and the fourth area as "none," the ALJ will conclude that any impairments are not severe, unless the evidence indicates otherwise. 20 C.F.R. § 404.1520a(d)(1). If any impairments are found to be severe at step two, the ALJ proceeds to step three, and compares the medical findings about the impairments and the functional limitation ratings with the criteria listed for each type of mental disorder in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 *et seq*.

In this case, at step two, the ALJ found that Jones had two severe impairments: depressive disorder, not otherwise specified, and borderline personality disorder with dissociation. T14. At step three, however, the ALJ found that Jones did not have an impairment or combination of impairments that met or medically equaled a listed impairment. T14. Jones does not dispute this finding on appeal.

### (c) Residual Functional Capacity

Before moving to step four, the ALJ must determine the claimant's residual functional capacity (RFC), which is then used at steps four and five. 20 C.F.R. § 404.1520(a)(4). "'Residual functional capacity' is defined as 'the most [a claimant] can still do' despite the 'physical and mental limitations that affect what [the claimant] can do in a work setting' and is assessed based on all 'medically determinable impairments,' including those not found to be 'severe.'" *Gonzales*, 465 F.3d at 894 n.3 (quoting 20 C.F.R. §§ 404.1545 and 416.945).

To determine a claimant's RFC, the ALJ must consider the impact of all the claimant's medically determinable impairments, even those previously

found to not be severe, and their related symptoms, including pain. 20 C.F.R. §§ 404.1529(d)(4) and 404.1545(a)(1) and (2). This requires a review of "all the relevant evidence" in the case record. 20 C.F.R. § 404.1545(a). Although the ALJ is responsible for developing the claimant's complete medical history, 20 C.F.R. § 404.1545(a)(3), the claimant bears the burden of proof to demonstrate his or her RFC. *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will consider "statements about what [the claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations," as well as descriptions and observations of the claimant's limitations caused by his impairments, including limitations resulting from symptoms, provided by the claimant or other persons. 20 C.F.R. § 404.1545(a)(3).

The RFC assesses the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(4). The mental requirements of work include, among other things, the ability: to understand, remember, and carry out instructions; to respond appropriately to supervision, coworkers, and work pressures in a work setting; to use judgment in making work-related decisions; and to deal with changes in a routine work setting. 20 C.F.R. §§ 404.1545(c) and 404.1569a(c); SSR 96-8p, 61 Fed. Reg. 34474-01, 34477 (July 2, 1996). An RFC must assess the claimant's ability to meet the mental requirements of work, 20 C.F.R. § 404.1545(a)(4), which includes the ability to respond appropriately to coworkers and work pressures. 20 C.F.R. §§ 404.1545(c) and 404.1569a(c); SSR 96-8p, 61 Fed. Reg. at 34477. The RFC must include all limits on work-related activities resulting from a claimant's mental impairments. SSR 85-16, 1985 WL 56855, at *2 (1985).

A special procedure governs how the ALJ evaluates a claimant's symptoms. The ALJ first considers whether the claimant suffers from "medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms." 20 C.F.R. § 404.1529(a) to (c)(1). A medically determinable impairment must be demonstrated by medical signs or laboratory evidence. 20 C.F.R. § 404.1529(b). If this step is satisfied, the ALJ then evaluates the intensity and persistence of the claimant's symptoms to determine how they limit the claimant's ability to work. 20 C.F.R. § 404.1529(c)(1). This again requires the ALJ to review all available evidence, including statements by the claimant, "objective medical evidence,"[4] and

---

[4] 20 C.F.R. §§ 404.1529(c)(2) and 404.1528(b) and (c).

"other evidence."[5] 20 C.F.R. § 404.1529(c)(1) to (3). The ALJ then considers the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, and evaluates them in relation to the objective medical evidence and other evidence. § 404.1529(c)(4). Ultimately, symptoms will be determined to diminish the claimant's capacity for basic work activities, and thus impact the claimant's RFC, "to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms . . . can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*; § 404.1529(d)(4).

In assessing the credibility of a claimant's subjective testimony regarding his or his alleged symptoms, the ALJ must weigh a number of factors. *See, Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009); 20 C.F.R. § 404.1529(c)(3)(i–vii).[6] When deciding how much weight to afford the opinions of treating sources and other medical opinions regarding a claimant's impairments or symptoms, the ALJ considers a number of factors set forth in 20 C.F.R. § 404.1527.

The ALJ developed the following RFC for Jones:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) except she is able to lift and/or carry 20 pounds occasionally and 10 pounds on a frequent basis, stand/walk (with normal breaks) 6 hours in an 8-hour day, and sit (with normal breaks) 6 hours in an 8-hour day. Pushing and pulling in the bilateral upper and lower extremities, including operation of hand and foot controls, is unlimited other than as indicated above for lift and/or carry. From a mental standpoint, she is able to understand, remember, and carry out simple work not requiring math skills, but including repetitive work. She is precluded from contact with the public, and should have minimal contact with co-workers and supervisors.

T16.

---

[5] "Other evidence" includes information provided by the claimant, treating and non-treating sources, and other persons. *See* 20 C.F.R. § 404.1529(a) (and sections referred to therein); *see also* 20 C.F.R. § 404.1529(c)(3).

[6] In assessing a claimant's credibility, the ALJ should consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Moore*, 572 F.3d at 524.

As is common in these cases, the ALJ found that Jones' "medically determinable impairments could reasonably be expected to cause the alleged symptoms"; but that Jones' statements "concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with" the ALJ's RFC assessment. T17. On this point, the ALJ found that Jones' "allegations of limitations that precludes [sic] all types of work are inconsistent with the objective medical evidence, the absence of more aggressive treatment, medical opinions, and the evidence as a whole, and thus, the allegations are not fully credible." T20. To support this conclusion, the ALJ cited instances in the record which suggest Jones' ability to work; her infrequent visits to the doctor and failure to seek out counseling despite allegations of total disability; evidence that Jones' symptoms were controlled even when she was not on medication; the absence of any medical restrictions placed on Jones; and Jones' ability to care for children, which "can be quite demanding both physically and emotionally." T20-21. The ALJ concluded that, "[a]lthough the evidence establishes underlying medical conditions capable of producing some limitations, the substantive evidence of record does not confirm disabling limitations arising from those impairments, nor does it support a conclusion that the objectively determined medical conditions are of such severity that they could reasonably be expected to give rise to disabling limitations." T23.

### (d) Steps Four and Five

At step four, the claimant has the burden to prove that she lacks the RFC to perform her past relevant work. *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can still do her past relevant work, she will be found to be not disabled, otherwise, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy that the claimant can perform. *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(v).

Here, the ALJ found that Jones had no past relevant work, and therefore proceeded to step five. T23. At that stage, based on the testimony of the VE, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that Jones could perform. T23-24. So, the ALJ concluded that Jones was not under a disability, and denied her claims for benefits. T24.

### III. STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the

record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id.* The Court must consider evidence that both supports and detracts from the ALJ's decision, but will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id.* The Court reviews for substance over form: an arguable deficiency in opinion-writing technique does not require the Court to set aside an administrative finding when that deficiency had no bearing on the outcome. *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011). And the Court defers to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).

## IV. ANALYSIS
### 1. JURISDICTION

As an initial matter, the Court has some concern regarding its jurisdiction to review this appeal. It appears that Jones filed a separate claim (which was denied) in 2009 for alleged impairments that are substantially similar to the underlying claim. *Compare* T300; T305, *with* T174; T184.[7] Normally, under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action. *Baker v. General Motors Corp.*, 522 U.S. 222, 238 (1998). Specifically, res judicata applies to a Social Security claim where a claimant advances the same claim, based on the same facts and issues, from a previous proceeding in which the decision has become final. *See*, 20 C.F.R. § 404.957(c)(1); *Brown v. Sullivan*, 932 F.2d 1243 (8th Cir. 1991). Res judicata does not apply in the Social Security context, however, if the ALJ reopens a final determination "[w]ithin four years of the date of the notice of the initial determination." 20 C.F.R. 404.988.

The present claim appears to be based on new and material evidence, which, according to Jones' counsel, substantiated the reopening of the prior claim. Indeed, at the November 19, 2013 hearing, Jones' counsel—in response

---

[7] For example, the "notice of disapproved claim" that corresponds to the 2009 application lists an alleged disability due to "ADD, bipolar disorder, manic depression and frequent blackouts." T300. The 2012 form lists "ADD, bipolar, manic depressive, frequent blackouts, cutting, depression, and conditions [that] prevent you from going to sleep." T166.

to a remark regarding the 2009 claim—said, "[w]e deduce that based upon the new records . . . [a]nd the testimony today . . . which we believe would bolster—substantiate or be new and material evidence to that prior decision in both of those claims." T113. In response, the ALJ permitted Jones' counsel to present the evidence, but warned "don't you be mistaken that since I'm allowing evidence that I am allowing the reopening of the prior claim." T114. A similar exchange occurred at the subsequent hearing before the ALJ on April 29, 2014. *See* T82-83.

A claim may be treated as having been constructively reopened, despite statements to the contrary, when the SSA actually reconsiders the merits of the previously denied application. *See, King v. Chater*, 90 F.3d 323 (8th Cir. 1996); *Hudson v. Bowen*, 870 F.2d 1392 (8th Cir. 1989); *Jelinek v. Heckler*, 764 F.2d 507 (8th Cir. 1985). This may occur when the ALJ bases a decision—such as a determination of the claimant's residual functional capacity—on medical evidence presented in support of an earlier claim. *See Lowrey v. Astrue*, 2008 WL 320736 (E.D. Mo. Feb. 4, 2008) (citing *Jelinek*, 764 F.2d at 508)); *but cf. Burks-Marshall v. Shalala*, 7 F.3d 1346, 1348 (8th Cir. 1993) (mere allowance of evidence from the earlier application is insufficient, without more, to be considered a reopening of the earlier case). Here, the ALJ considered medical documents dating back to 2006, and gave "[s]ignificant weight" to at least one medical evaluation that was performed in connection with the 2009 application. *See* T21-22. Based on this fact, and upon a review of the record as a whole, the Court concludes that it has jurisdiction to review the claim.

## 2. APPEAL

Jones argues generally that the Commissioner's decision to deny benefits is inconsistent with legal and regulatory standards. In particular, Jones argues (1) the ALJ did not properly develop the record; (2) that the ALJ failed to give due consideration to all of the medical opinions of the state agency doctors; (3) that the ALJ erred in failing to incorporate all of Jones' documented limitations and conditions into the hypothetical question posed to the VE; and (4) that the ALJ improperly evaluated Jones' subjective allegations regarding her physical and mental condition, and, in doing so, failed to appropriately account for all of her impairments in determining her RFC.

### (a) The Record

Jones contends that the ALJ failed to properly develop the record. Filing 18 at 16. Specifically, Jones points to the November 19, 2013 hearing, in which the ALJ ordered an additional consultative psychological

- 13 -

examination with Margaret Donovan, Ph.D., due to the "minimal care that the plaintiff ha[d] received over the years." Filing 18 at 17; T152-154; T675. Following that evaluation, which took place on January 2, 2014, the ALJ proffered the report to Jones' counsel. In doing so, the ALJ advised Jones of her right to "submit written questions to be sent to the author(s) of the enclosed report(s)." T551.

In response to the proffer, Jones submitted additional questions to the ALJ, for Donovan, relating to Jones' ability "to follow work rules, use judgment, function independently, maintain attention/concentration, maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability." Filing 18 at 18. These additional questions, Jones contends, address deficiencies and inconsistencies in Donovan's report, and were designed to further assess Jones' sustained concentration and persistence. Filing 18 at 18.

But those questions were never submitted to Donovan. In explaining this decision, the ALJ remarked, "Dr. Donovan's report is adequate to fully inquire into the matters at issue," and that "the undersigned has considered not only Dr. Donovan's report, but the records of other psychologists and psychiatrists as well as his own observations of the claimant[.]" T22.

Jones argues that the ALJ, by not submitting the questions to Donovan, failed to fully develop the record. Specifically, by failing to submit the questions, Jones claims that the ALJ's decision to deny benefits was rendered without a complete assessment of Jones' mental condition as of the date of Donovan's evaluation. *See* filing 18 at 19-20. This, in turn, impacted the hypothetical question posed by the ALJ to the VE—which, Jones argues, "was insufficient to serve as substantial evidence supporting the decision of the Commissioner to deny benefits[.]" Filing 18 at 20.

The ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press her case. *See Brown v. Colvin*, 825 F.3d 936, 939 (8th Cir. 2016). This obligation includes a duty to order additional testing if existing test results are invalid, *see Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 824 (8th Cir. 2008), and, under some circumstances, to obtain additional medical evidence to determine whether a claimant is disabled. *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994). However, this duty does not, in every instance, require the ALJ to seek out additional information from the treating physician. Indeed, an ALJ need not seek clarifying statements from a treating physician "unless a crucial issue is undeveloped." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004); *see also Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1512(e), 416.912(e)).

- 14 -

Upon review of the entire record, the Court finds that no crucial issues were underdeveloped, and, therefore, that the ALJ did not err in refusing to submit the additional questions. This conclusion is supported not only by the ALJ's consideration of records from multiple psychologists and psychiatrists, but also from Donovan's report itself, which expressly addresses many of the questions submitted by Jones' counsel. For example, Jones suggests that Donovan's report fails to address certain issues such as Jones' personal appearance, her ability to maintain attention, and her ability to follow rules. But Donovan, in formulating the report, expressly notes that Jones had "good hygiene and grooming," T675, that she maintained good eye contact, and that her thought process was "clear, logical, and coherent." T679. In sum, Jones' contention that material issues remain underdeveloped is without merit.

### (b) Determination of RFC
#### (i) Dr. Braymen

Jones next contends that the ALJ, in arriving at the RFC, failed to consider all medical opinions contained in the record. Filing 18 at 21. Specifically, Jones argues that the ALJ "did not ever mention . . . [and] failed to incorporate" a report, conducted in 2009, by state psychological consultant Rebecca Braymen, Ph.D. Filing 18 at 22. In that report, as noted above, Braymen opined that Jones was moderately limited in her ability to sustain certain activity in the normal workday and workweek. *See* T586-87.[8] According to Jones, Braymen's conclusions should have been incorporated into the ALJ's findings of limitations, and into the hypothetical question posed to the VE. *See Howard v. Massanari*, 255 F.3d 577, 581-82 (8th Cir. 2001) (hypothetical question must precisely describe claimant's impairments so that VE may accurately assess whether jobs exist for claimant).

The ALJ, in arriving at Jones' RFC, noted that the "mental limitations set forth in the residual functional capacity accept and adopt the opinion of

---

[8] Specifically, Braymen concluded that Jones was moderately limited in the ability to: understand, remember, and carry out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of, and take appropriate precautions for, normal hazards; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independent of others.

the State agency psychological experts expressed in . . . Exhibits 8F and 13F." T22. Those exhibits—8F and 13F—correspond to the evaluations of state agency psychological consultants Linda Schmechel, Ph.D. (T619) and Helen Montoya, Ph.D. (T650-51). Thus, as Jones contends, the ALJ did not specifically cite to Braymen's evaluation in his discussion of the RFC.

Although an ALJ is "not required to discuss every piece of evidence submitted," *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (internal quotation marks omitted), he is required to consider the findings made by state agency physicians and psychologists. *See Webster v. Astrue*, 628 F. Supp. 2d 1073, 1091 (D. Neb. 2009). Additionally, in considering such evidence, the ALJ "must explain the weight given to these opinions in their decisions." SSR 96–6p, 1996 WL 374180 (S.S.A. July 2, 1996).

It is clear, upon review of the decision denying benefits, that the ALJ did not "explain the weight" that he assigned to Braymen's report. But while failing to do so may, in some circumstances, necessitate remand, the Court is not persuaded that such action is required here. *See Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) ("a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's findings where the deficiency [has] no practical effect on the outcome of the case.") (internal quotation marks and citation omitted). To this end, Braymen's report supports—not undermines—the ALJ's ultimate determination. Indeed, although Braymen identified several areas in which Jones was limited in her capacity to sustain certain work activities, such limitations, Braymen wrote, "do not appear to preclude all simple, unskilled employment at SGA level." T603.[9]

Further, although Braymen's report is not expressly cited in the ALJ's opinion, Braymen's observations were discussed at the April 29, 2014 hearing. There, Jones' counsel cross-examined the VE following the ALJ's initial hypothetical, adding conditions that, in counsel's view, were responsive to Braymen's observations. T103-04. For example, counsel appropriately added certain limitations pertaining to the worker's ability to interact with others, work without interruptions, and accept instructions and criticisms from coworkers. *See* T103-04. Even considering these additional conditions, the VE maintained his opinion that—despite potential difficulties—the worker would nonetheless be capable of maintaining work. T104-05.[10]

---

[9] Section III of Braymen's RFC assessment is found in the record at T588. That section, however, directs the reader to comments on a separately filed Psychiatric Review Technique, which can be found at T603.

[10] The VE was hesitant to answer this question given the contours of counsel's added conditions. T104. He also suggested that, despite the worker's likely ability to work, he or she may not be able to sustain long-term employment. T104-05.

- 16 -

As a final matter, the limitations that Braymen identified—and which Jones contends should have been incorporated into the hypothetical posed to the VE—are found in section I of Braymen's mental residual functional capacity assessment. *See* T586-87. According to the Commissioner's Program Operations Manual System (POMS), that section, which contains the "summary conclusions," is a worksheet that assists in the determination of the presence and degree of functional limitations. It does not, however, constitute the RFC assessment. POMS § DI 24510.060B.2. Rather, the mental RFC assessment is found in section III of the report, which provides, among other information, an explanation of the conclusions indicated in section I. POMS § DI 24510.060B.4. And a review of section III of Braymen's report indicates that, in Braymen's perspective, Jones was able to conduct simple, unskilled work notwithstanding the limitations listed in section I.[11]

Thus, because it is section III that contains the actual assessment, the Court concludes that the ALJ did not err in omitting the restrictions identified in section I from his RFC analysis. *See Sitzman v. Astrue*, 2012 WL 1437281, at *9 (D. Neb. 2012) (citing *Kane v. Astrue*, 2011 WL 3353866, at *3 (N.D. Ohio 2011) (compiling cases reaching the same result)).

### (ii) Dr. Schmechel

Jones further argues that the ALJ failed to incorporate the conclusions of Linda Schmechel, Ph.D. (affirmed by Helen Montoya, Ph.D., upon reconsideration), into the hypothetical question posed to the VE. Filing 18 at 24. Schmechel, as noted above, reviewed Jones' records in connection with the underlying claim. In doing so, Schmechel opined that Jones was markedly and moderately limited in her ability to sustain certain activity in the normal workday and workweek. *See* T619-20.[12] The ALJ, in the order denying benefits, noted that the "mental limitations set forth in the residual

---

[11] Braymen also wrote: "[Jones'] affect is blunted, mood is anxious. Memory is intact. There is no indication of psychosis. Judgment is poor. She has poor frustration tolerance. Intellectual ability is average to low average. . . . She does not maintain social functioning. She is able to sustain attention and concentration for simple tasks." T603. It is the Court's view that the hypothetical on which the ALJ relied (T101-02) sufficiently accounted for these limitations.

[12] Schmechel concluded that Jones was "markedly limited" in her ability to understand and remember detailed instructions, and her ability to interact appropriately with the general public. Jones was "moderately limited" in her ability to: carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods; and to set realistic goals or make plans independently of others. *See* T619-20.

functional capacity accept and adopt the opinion of the State agency psychological experts." T22.

Thus, Jones argues that the ALJ both accepted and overlooked the consultant's observations in determining the RFC. But, for the reasons discussed above, this argument is without merit. The limitations listed in Schmechel's report—and which form the basis for Jones' argument—are found in section I of Braymen's assessment. T619-20. Section III, which contains the RFC, suggests only that Jones has moderate limitations in carrying out complex instructions, is socially avoidant, and has the capacity for simple work with intermittent supervision, so long as the work is not "highly interpersonal." T637. And the Court concludes that, based on those limitations, the hypothetical question posed to the VE captured the concrete consequences of the claimant's deficiencies. *See* T101. *See also Cox v. Astrue*, 495 F.3d 614, 620 (8th Cir. 2007).

### (c) Credibility

Jones argues that the ALJ improperly discredited her testimony regarding her limitations. In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ need not explicitly discuss each factor—rather, it is sufficient if he acknowledges and considers the factors before discounting the claimant's subjective complaints. *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009).

Here, the ALJ found that Jones' complaints of disabling symptoms— namely, frequent blackouts and physical pain—were not entirely credible, noting in part that Jones had not received the type of medical treatment one would expect for a totally disabled individual. T21. The ALJ also noted that Jones sought care from a general practitioner, as opposed to a specialist, and that she was generally unmotivated to seek out medication that improved her conditions. T21. Jones argues that these considerations were improper because they fail to account for her limited financial resources and lack of access to medical care. Filing 18 at 28-29.

As a general matter, a lack of financial resources may justify the failure to seek medical attention, or to follow prescribed treatment. *See Johnson v. Bowen*, 866 F.2d 274, 275 (8th Cir. 1989). But the Eighth Circuit has determined that, to justify a claimant's failure to seek medical care, the claimant must generally present evidence that he or she sought out—yet was

denied—medical treatment due to financial hardship. *See*, *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005); *Murphy v. Sullivan*, 953 F.2d 383, 386-87 (8th Cir. 1992). And here, Jones failed to do so. Thus, in the absence of such evidence, Jones' argument that the ALJ erred in discounting her credibility is unavailing. Further, it should be noted that the ALJ, in discussing Jones' credibility on these grounds, expressly considered Jones' claim of financial hardship in the context of the broader record. In doing so, the ALJ remarked, "Understandably, the claimant's access to medical care is hampered by her lack of insurance and financial resources. Yet even when referred to a free medical clinic in Norfolk in July 2013 she did not take advantage of this resource." T21.

Jones next argues that the ALJ improperly discredited her credibility regarding the "significant level of problems noted by the consultative examiner, Dr. Preston[.]" Filing 18 at 29. In advancing this argument, Jones appears to suggest that, because her testimony was consistent with Dr. Preston's findings, her testimony was necessarily credible for purposes of her RFC. But as the Commissioner points out, the ALJ's RFC is consistent with Dr. Preston's conclusions. Accordingly, reversal is not warranted on these grounds.

Finally, Jones argues that because the ALJ failed to appropriately account for all of Jones' impairments in determining her RFC, the hypothetical question posed to the VE was necessarily deficient. But a hypothetical must include only those impairments and limitations that are supported by the record, which the ALJ accepts as valid, and which the ALJ finds to be credible. *Gragg v. Astrue*, 615 F.3d 932, 940 (8th Cir. 2010); *Young*, 221 F.3d at 1069. Jones' argument is really that the ALJ should have based Jones' limitations on the evidence that the ALJ, as discussed above, did not find credible. The Court has already rejected the basis of that argument.

## V. CONCLUSION

The Court has reviewed the administrative record and finds that the ALJ did not err in any of the ways asserted by Jones. The Court therefore concludes that the Commissioner's decision was supported by substantial evidence and must be affirmed.

IT IS ORDERED:

1.     The Commissioner's decision is affirmed.

2.     Jones' complaint is dismissed.

3.     The parties shall bear their own costs.

4.     A separate judgment will be entered.

Dated this 15th day of February, 2017.

BY THE COURT:

John M. Gerrard
United States District Judge